UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PIRATA P.S.C.,                                )
                                              )
    Plaintiff,                                )       Civil Action No. 3:22-CV-627-CHB
                                              )
v.                                            )
                                              )       **MEMORANDUM OPINION AND**
BANK OF AMERICA, NA,                          )       **ORDER**
                                              )
    Defendants.                               )

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on the Motion for Summary Judgment, [R. 65], and Motion to Exclude Expert Testimony of Obaid Omran Ali Obaid Al Shamsi (hereinafter "Motion to Exclude"), [R. 66], each filed by Defendant Bank of America, NA (hereinafter, "Defendant"). Plaintiff Pirata P.S.C. (hereinafter, "Plaintiff")[1] filed responses to each motion, [R. 71 (Response to Motion for Summary Judgment)]; [R. 72 (Response to Motion to Exclude)], and Defendant replied, [R. 73 (Reply to Motion for Summary Judgment)]; [R. 74 (Reply to Motion to Exclude)]. This matter has therefore been fully briefed and is ripe for review. For the reasons that follow, the Court will grant Defendant's Motion to Exclude and Motion for Summary Judgment.[2]

---

[1] Although the named plaintiff in this action is Pirata P.S.C., the entity's sole shareholder and president is Jeffrey Sexton. [R. 65-5, pp. 2–6]; [R. 65-2, p. 11:3–5 (Sexton Depo.)]. Accordingly, many actions in this matter taken on behalf of Plaintiff have been performed by Mr. Sexton. *See, e.g.*, [R. 65-8 (bank record of monetary transfer listing "Pirata P.S.C. DBA Jeffrey A. Sexton, Attorney")]; [R. 65-9 (same)]; [R. 65-12 (Scam Victim Acknowledgment form signed by Mr. Sexton)].

[2] With respect to the various depositions in this matter, page number citations refer to the ECF-assigned page number, not the page number included in the original filings, as there are sometimes disparities between the two.

- 1 -

## I.   BACKGROUND

This suit arises out of a scam perpetrated against the plaintiff. On April 20, 2021, Mr. Sexton, a lawyer and sole shareholder of Plaintiff, acting on behalf of Plaintiff, sent $650,000 via wire transfer from Plaintiff's Bank of America bank account to an account at the Commercial Bank of Dubai (hereinafter, "CBD") maintained by Options Mortgage Brokers (hereinafter, "Options"). [R. 65-9, p. 2]. Mr. Sexton sent these funds under the belief that he needed to purchase an insurance policy in order to receive a loan of $100,000,000 from the Bahrain-based company Wesam Gulf Properties & Investments Co. W.L.L. [R. 65-2, p. 20:11–25 (Sexton Depo.)]; [R. 65-15, pp. 1–3]. By the next day, April 21, 2021, the funds were received by CBD and had been credited to Options's account. [R. 65-1, pp. 25:4–15, 26:2–7]; [R. 65-10, p. 8]. However, Options denied receipt of the funds, [R. 65-2, p. 51:5–18 (Sexton Depo.)], and Wesam and Options each requested that Mr. Sexton provide proof of transfer, [R. 65-16, pp. 52–53 (Wesam)]; [R. 65-17, p. 4 (Options)]. At Mr. Sexton's request, Defendant initiated a wire trace for the funds, [R. 65-1, pp. 26:20–28:7, 34:19–35:15]; [R. 65-10, p. 3], and at Plaintiff's subsequent request, also initiated a recall on April 27, 2021, [R. 65-1, pp. 37:10–17]; [R. 65-10, pp. 5–6].

By May 5, 2021—within a few weeks of the initial transfer—Mr. Sexton began to suspect he had been scammed. [R. 65-19, p. 30 (describing "possible fraud" in an email on May 5, 2021)]. By May 10, 2021, Mr. Sexton seemingly realized he had certainly been scammed. [R. 65-16, p. 50 (stating "I have been defrauded" in an email on May 10, 2021)]. Although Wesam and Options changed course the next day, telling Mr. Sexton on May 11, 2021 that Options' account with CBD had received the wired funds and promising to return the funds, [R. 65-2, pp. 76:25–77:8; 190:10–13; 190:21–24 (Sexton Depo.)]; [R. 65-20, p. 9], Mr. Sexton reiterated his belief that he had been scammed shortly thereafter. [R. 65-12, p. 2 (stating Mr. Sexton informed Defendant on June 10,

2021 that it had transferred funds "to a third party as a result of a scam")]; [R. 65-21, p. 4 (describing Options as a "scam or fraud" on June 29, 2021)]. On June 15, 2021, Defendant sent Mr. Sexton a letter offering "to help [him] in [his] effort to recover the funds" and requesting that he sign and return an attached Scam Victim Acknowledgement form, but noting that "there is no guarantee that the financial institution still has your funds on deposit or will take action to comply with our request on your behalf." [R. 65-12, p. 2]. Mr. Sexton signed and returned the Scam Victim Acknowledgment form (hereinafter, "SVA form") on behalf of Plaintiff that same day, in which he acknowledged and agreed to the following, among other statements:

> **Any action by [Defendant] on behalf of [Plaintiff] with respect to the Recovery Effort is a voluntary accommodation** by [Defendant] to [Plaintiff] and is not an admission of any liability by [Defendant]. [**Defendant**] **may pursue the Recovery Effort in its sole and absolute discretion** and [**Defendant**] **provides no assurance to [Plaintiff] that the Recovery Effort will be successful. [Plaintiff] acknowledges the possibility that the Recovery Effort may result in no recovery for the Client**.
>
> * * *
>
> If the Recipient's Bank fails or refuses to act upon [Plaintiff's] Recovery Effort or requires the filing of an appropriate action in court to return all or a portion of any funds that remain, **it will be [Plaintiff's] responsibility to file an action. If that's the case, [Defendant] recommends that [Plaintiff] promptly retain and seek the advice of an attorney of [Plaintiff's] choice**.

*Id.* at 3–4 (emphasis added).

The day after Mr. Sexton submitted the signed SVA form, Defendant sent a formal recall letter to CBD requesting that CBD block access to the $650,000 in Options's bank account and offering to indemnify CBD as to any claims that may arise due to the actions taken by CBD. [R. 65-13, pp. 2–4]. Additional recall requests were sent, *see* [R. 65-10, pp. 6–15], and although CBD received these, CBD advised that it could not return Plaintiff's funds without authorization from Options, *see, e.g.*, *id.* at 6 ("[CBD has] requested debit authority from [Options] and will

proceed to return funds upon receipt of same."); [R. 65-1, pp. 40:17–41:24, 42:10–43:2, 48:8–22]. As part of its efforts to recover the funds, Mr. Sexton called Defendant's customer service representatives on multiple occasions. *See* [R. 65-25]; [R. 65-3, pp. 6:3–9:15, 14:8–25:14]. During one of those conversations on June 21, 2021, Defendant's customer service representative stated that Mr. Sexton's request was "pending collections," clarifying that Defendant had "this whole scam part . . . figured out" and was "just waiting for the funds to return to the account" or, in other words, "waiting for the actual collections part" of the process. [R. 65-25, pp. 2–3]. The representative advised that although the shift to "pending collections status" meant the matter was "per se resolved" and the money was "on the way back into [Plaintiff's account]," the matter "could take anywhere up to July 8 to resolve" and Mr. Sexton should "call back at least once a week" to check in. *Id.* at 3–4. During his deposition, Mr. Sexton stated that he understood this employee's statements to mean that his "[m]oney was on its way back" to him and he felt "an incredible sense of relief" as a result thereof. [R. 65-3, pp. 12:17–13:8].

Just one week later, however, Mr. Sexton's attitude appeared to shift, as on June 29, 2021 he complained to a CBD representative that Options would "never" provide the debit authority needed to return the funds to his account and accused CBD of being "complicit in this scam by continuing to seek debit authority that it knows will not be forthcoming." [R. 65-21, p. 4]. Once the funds were not returned to his account by July 8, 2021, Mr. Sexton knew Defendant had been unsuccessful in its recovery efforts at that time. [R. 65-2, pp. 166:18–167:7 (Sexton Depo.)]. Ultimately, CBD never returned the funds sent to Options and Wesam. *Id.* at 188:17–18. Defendant informed Plaintiff that its recovery efforts were unsuccessful on November 5, 2021. [R. 71-5].

Plaintiff filed this action before the Jefferson Circuit Court on November 3, 2022, [R. 1-2], and it was removed to this Court on November 28, 2022, [R. 1-1]. Plaintiff then amended its

Complaint twice. [R. 11 (Amended Complaint)]; [R. 15 (Second Amended Complaint)]. Plaintiff's Second Amended Complaint alleged three causes of action against Defendant, pled in the alternative: negligent execution of wire instructions (Count I); negligent recovery (Count II); and negligence (Count III). [R. 15, ¶¶ 26–58]. Through these causes of action, Plaintiff claims Defendant negligently executed its efforts to recover Plaintiff's funds and hindered Plaintiff's ability to recover the funds through Plaintiff's own efforts. *Id.* at ¶¶ 13–14, 17–22, 24–25. The Court dismissed Plaintiff's first cause of action and allowed Plaintiff's remaining claims to proceed to discovery. [R. 31, p. 16].

Presently before the Court are Defendant's Motion for Summary Judgment, in which Defendant argues Plaintiff's remaining claims fail as a matter of law under Federal Rule of Civil Procedure 56, *see generally* [R. 65], and Defendant's Motion to Exclude, in which Defendant argues the testimony of Plaintiff's expert witness, Obaid Omran Ali Obaid Al Shamsi, should be excluded under Federal Rules of Evidence 702 and 703, *see generally* [R. 66]. Plaintiff filed responses to each motion, [R. 71 (Response to Motion for Summary Judgment)]; [R. 72 (Response to Motion to Exclude)], and Defendant replied, [R. 73 (Reply to Motion for Summary Judgment)]; [R. 74 (Reply to Motion to Exclude)]. The matter is therefore ripe for review.

Because the admissibility of Plaintiff's expert witness testimony impacts the evidence available to the Court to consider in its ruling on Defendant's Motion for Summary Judgment, the Court will first resolve Defendant's Motion to Exclude before turning to Defendant's Motion for Summary Judgment.

## II.    MOTION TO EXCLUDE

Defendant's Motion to Exclude addresses the proffered testimony of Obaid Omran Ali Obaid Al Shamsi (hereinafter, "Mr. Al Shamsi"), the managing partner of a Dubai law firm who

has served as an expert witness in various matters before courts in the United Arab Emirates (hereinafter, "UAE") over the last five years. [R. 66, pp. 2–3]; [R. 72-1, pp. 3–4]. Plaintiff retained Mr. Al-Shamsi to testify as to "whether Plaintiff could have initiated any actions, whether criminal, civil or regulatory, in the UAE to attempt to recover the transferred funds." [R. 72-1, p. 4]. In summary of his testimony, Mr. Al-Shamsi states that "[t]here were causes of action available to Plaintiff in the UAE to discover the statuses of the [t]ransfer and the [f]unds and to recover the [f]unds," that "it is more likely than not that Plaintiff could have recovered the [f]unds[] if he had pursued one or more of these causes of action in the UAE within ninety (90) to one hundred and twenty (120) days from the date of transfer, April 20, 2021," and that it was "negligent" to tell Plaintiff "that the [f]unds would be returned" and that "the [f]unds were in Options' CBD account" without "an explicit and unambiguous communication from the corresponding financial institution." *Id.* at 7–8. Defendant's Motion to Exclude argues Mr. Al Shamsi's testimony is "unreliable, speculative, [and] irrelevant," rendering it inadmissible under the Federal Rules of Evidence. [R. 66, p. 1].

### A. Legal Standard

Federal Rule of Evidence 702 governs the use of expert testimony and guides the Court's analysis. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Based on the language of Rule 702, the Sixth Circuit has found that an expert's opinion is admissible if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

Ultimately, the trial judge is the gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (recognizing "a gatekeeping role for the judge" under Rule 702). However, the proponent of the testimony bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *accord* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("This is the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules."). Despite this burden, "rejection of expert testimony is the exception, rather than the rule," *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) (quotation omitted) (quoting *In re Scrap Metal*, 527 F.3d at 530)). With this standard in mind, the Court turns to the pending Motion to Exclude. [R. 66].

**B. Analysis**

The Court will first address the reliability of Mr. Al Shamsi's expert opinion. As outlined above, Rule 702 provides general standards by which a trial court assesses reliability: whether "the testimony is based on sufficient facts or data," "whether the testimony is the product of reliable principles and methods," and whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, the Supreme Court provides a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert

testimony, including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593–94). However, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The Sixth Circuit thus "recognize[s] that the Daubert factors are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *Id.* (internal quotation marks and citation omitted).

Defendant's Motion to Exclude contends that Mr. Al Shamsi's testimony is unreliable; in other words, it "is not 'based on sufficient facts or data,' 'the product of reliable principles and methods,' and does not 'reflect[] a reliable application of the principles and methods to the facts of the case.'" [R. 66, p. 4 (citing Fed. R. Evid. 702)]. In support, Defendant argues Mr. Al Shamsi provides "no reason to credit his opinion," as he shares "no data regarding recovery rates in similar cases, no information about the proof required for each cause of action, and . . . does not even apply the causes of action to Plaintiff's situation." *Id.* at 5. According to Defendant, Mr. Al Shamsi's conclusions thus "amount to improper speculation, at best," especially in light of other statements from Mr. Al Shamsi's report suggesting that Plaintiff's failure to timely retain UAE counsel was the true problem with Plaintiff's recovery efforts—statements that undermine Mr. Al Shamsi's conclusion that Defendant was the true cause of Plaintiff's inability to recover the funds. *Id.* Finally, Defendant notes that experts who "simply parrot[] the plaintiff's positions without any expert analysis [are] properly subject to exclusion," and argues Mr. Al Shamsi's opinion meets this description. *Id.* at 6.

In response, Plaintiff contends Mr. Al Shamsi's decades of experience inform his opinion, and this indicates the reliability of his opinion in a manner sufficient to satisfy Federal Rule of Evidence 702. [R. 72, p. 5]. Plaintiff argues the reliability of Mr. Al Shamsi's opinion is bolstered by Mr. Al Shamsi's review of communications between Mr. Sexton and Defendant's representatives, SWIFT messages between Defendant and CBD, and the deposition transcript of Defendant's representative. *Id.* at 5–6. Plaintiff also claims that opinions about the likelihood of recovery like Mr. Al Shamsi's are not conjectural when they are "grounded in expertise and facts." *Id.* at 6–7. As a final point, Plaintiff frames Mr. Al Shamsi's opinion as "sufficient to tilt the balance from possibility to probability" that Defendant caused Plaintiff's harm, *id.* at 7 (quoting *Holbrook v. Rose*, 458 S.W.2d 155, 158 (Ky. App. 1970) (quotations omitted)), and as having proven that it is "more likely than not" that Plaintiff's injury was caused by Defendant's negligence, *id.* (quoting *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210, 214 (Ky. App. 2001)).

In reply, Defendant points out that Mr. Al Shamsi's qualifications to be an expert witness present a distinct issue from the reliability of his opinions, rendering Plaintiff's references to Mr. Al Shamsi's experience and knowledge regarding practicing in the UAE unpersuasive. [R. 74, p. 3]. Defendant characterizes Plaintiff's argument that Mr. Al Shamsi's opinion has sufficient basis because it arises from his experience as "anecdotal evidence and extrapolation by another name." *Id.* Namely, Defendant contends Plaintiff fails to demonstrate how the documents Mr. Al Shamsi reviewed lead to his conclusion that it is "more likely than not" that Plaintiff could have recovered the funds within ninety to one hundred and twenty days of the date of transfer had Plaintiff pursued a cause of action within the UAE during that timeframe. *Id.* at 3–4. Defendants reiterate that they argue "there are *no facts or data* supporting Al Shamsi's testimony, nor any

reliable and valid methods through which he drew his conclusions," making his opinion testimony inadmissible. *Id.* at 4 (emphasis in original).

The Court finds Defendant's arguments persuasive. As Defendants note, the Sixth Circuit requires that "[a]n expert opinion submitted in the context of a summary judgment motion must be more than a conclusory assertion about ultimate legal issues." *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (internal quotations omitted) (quoting *Hayes v. Douglas Dynamics*, 8 F.3d 88, 92 (1st Cir.1993)). An expert opinion "must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Id.* at 664 (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579–80 (11th Cir. 1985)). By contrast, where an expert "supplies nothing but a bottom line," *id.* at 665 (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989)), or their opinion is made up of "mere suppositions," *Rose v. Truck Centers Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010), a court may disregard the expert's opinion as unreliable under Rule 702.

Defendant is correct that Mr. Al Shamsi's opinion lacks any explanation whatsoever— beyond his experience working in the UAE—for his assertion that it is "more likely than not that Plaintiff could have recovered the [f]unds[] if he had pursued one or more . . . causes of action in the UAE within ninety (90) to one hundred and twenty (120) days from the date of transfer." *See* [R. 72-1, p. 7].[3] This Court's review of Mr. Al Shamsi's report reveals his reference to the ninety-to-one-hundred-and-twenty-day timeline appears to refer specifically to regulatory complaints before the Central Bank of the UAE (hereinafter, "CBUEA"), rather than the timeframe within

---

[3] Even if the Court accepts Mr. Al Shamsi as reliable and credits Plaintiff's theory, Plaintiff still cannot prove causation under his own theory. *See infra* Section III.B.2. This is because Plaintiff admits he knew by July 8, 2021—within ninety days of the wire transfer—that Defendant's recovery efforts had failed. [R. 65-2, pp. 166:18–167:7 (Sexton Depo.)]. Additionally, the terms of the SVA form reveal that Plaintiff was told—and agreed—that it was his responsibility to hire counsel and file a lawsuit if the Recipient Bank failed to return the funds. *See* [R. 65-12, p. 4].

which Plaintiff must seek civil or criminal penalties. *See id.* at 10 (describing "[f]iling a regulatory complaint with the CBUAE" as one of Plaintiff's legal options in the UAE), 12 (noting that "[t]he CBUAE . . . generally requires complaint[s] to be submitted within ninety (90) days" but nowhere addressing the timeline to seek civil or criminal penalties). Moreover, Mr. Al Shamsi elsewhere states that civil and criminal claims typically expire *three years* after the date the aggrieved party discovered the harm—far longer than his asserted ninety-to-one-hundred-and-twenty-day timeframe. *Id.* at 13. And nowhere does Mr. Al Shamsi indicate from where he elucidated 120 days as the point beyond which Plaintiff's recovery is no longer "more likely than not." *See generally id.*

Nor does Mr. Al Shamsi indicate precisely why he opines it is "more likely than not" that Plaintiff would have recovered the funds within that timeframe, as opposed to merely "likely," "possible," or any other probabilistic adjective. *See generally id.* Although he states that "UAE authorities may view late complaints or applications for interim measures . . . as less urgent, reducing the chance of success" and that some causes of action available in 2021 may be "less effective or unavailable due to changes in the law," *id.* at 12, 13, Mr. Al Shamsi provides no data upon which he bases his conclusion that Plaintiff "more likely than not" would have recovered had be sought legal action in the UAE within ninety-to-one-hundred-and-twenty-days, *see generally id.* For instance, Mr. Al Shamsi shares no summaries of data comparing recovery rates for plaintiffs who bring suit within ninety days versus after ninety days have passed, or any other reliable methodology that might shift his opinion from mere speculation into the realm of reality.

Taken together, Mr. Al Shamsi applies *no* "principles and methods" whatsoever in his expert testimony, much less the "reliable principles and methods" required by Rule 702. Fed. R. Evid. 702. Mr. Al Shamsi's years of experience working in the UAE, standing alone, is insufficient

- 11 -

to render his opinion reliable and admissible. *See* Fed. R. Evid. 702 advisory committee's note (2000) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). Because Mr. Al Shamsi's testimony amounts to no more than "mere guess or speculation," *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993) (quotation omitted)), the Court will grant Defendant's Motion to Exclude, and accordingly will not consider Mr. Al Shamsi's opinion in its evaluation of Defendant's Motion for Summary Judgment.

## III.    MOTION FOR SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment seeks the dismissal of Plaintiff's claims on multiple grounds, including Plaintiff's failure to establish any breach of a duty owed to Plaintiff by Defendant and Plaintiff's inability to establish causation, among other arguments.[4]

### A.  Legal Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

---

[4] Because the Court finds these arguments sufficient to award summary judgment in Defendant's favor, the Court declines to address Defendant's other arguments raised in its Motion for Summary Judgment.

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving

party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

### B. Analysis

Two causes of action remain against Defendant: negligent recovery (Count II); and negligence (Count III). [R. 15, ¶¶ 35–58]; [R. 31, p. 16]. "The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citing *Pathways, Inc., v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)). Defendant's Motion for Summary Judgment disputes the adequacy of Plaintiff's claims as a matter of law with respect to each element of negligence. *See* [R. 65, p. 17]. Because the Court ultimately finds Defendant's arguments as to duty, breach, and causation sufficient to award summary judgment in Defendant's favor, the Court declines to address Defendant's other arguments.

#### 1.  Duty and Breach

In considering duty at the summary judgment stage, the Court first notes that "[d]uty presents a question of law, whereas breach . . . [is a] question[] of fact for the jury to decide." *Patton*, 529 S.W.3d at 729. Accordingly, "[t]he existence of a duty of care running from the defendant to the plaintiff presents a question of law disposable on summary judgment." *Rousey v. United States*, 115 F.3d 394, 396 (6th Cir. 1997) (citing *Sellers v. United States*, 870 F.2d 1098, 1102 (6th Cir.1989) (per curiam); *Joy v. E. Maine Med. Ctr.*, 529 A.2d 1364, 1365 (Me.1987)). Once a duty of care is established, "the question becomes whether defendant failed to exercise

reasonable care under the circumstances, i.e., whether defendant breached the duty." *Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 404 (6th Cir. 2004). If a defendant does not exercise reasonable care, it breaches its duty. *Id.*

Defendant advances several arguments that it had no duty of care to Plaintiff and that, in any event, no breach of any such duty occurred. *See* [R. 65, pp. 17–27]. As an initial matter, Plaintiff fails to respond to Defendant's argument that it owed no fiduciary duty to Plaintiff. *See* [R. 65, pp. 19–20]; [R. 73, p. 9 n.1]; *see generally* [R. 71]. Accordingly, this argument is waived, and the Court finds Defendant owed Plaintiff no fiduciary duty. *See Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) (explaining that a plaintiff concedes those issues they fail to address in responding to a dispositive motion).

### a. Contractual Duty

Defendant's next duty-related argument contends that the terms of the Deposit Agreement, Online Banking Service Agreement, and SVA form demonstrate that it had no duty to recover any losses caused by Plaintiff, third parties, or events beyond Defendant's control. [R. 65, pp. 18–19].[5] In support, Defendant points to the various contractual provisions. Most notably, the SVA form provides:

> **Any action by [Defendant] on behalf of [Plaintiff] with respect to the Recovery Effort is a voluntary accommodation** by [Defendant] to [Plaintiff] and is not an admission of any liability by [Defendant]. [**Defendant**] **may pursue the Recovery Effort in its sole and absolute discretion** and [**Defendant**] **provides no assurance to [Plaintiff] that the Recovery Effort will be successful. [Plaintiff] acknowledges the possibility that the Recovery Effort may result in no recovery for the Client**.

---

[5] Page number citations refer to the ECF-assigned page number, not the page number included in the original filings, as there are sometimes disparities between the two.

[R. 65-12, p. 3 (SVA form) (emphasis added)].[6]

Defendant argues these contractual provisions govern the scope of its duty. *See* [R. 73, pp. 9–10 (collecting cases)]. Specifically, Defendant contends that "[w]here a written 'agreement establishes a contractual relationship between a bank and its customer . . . the duties arising from that relationship are limited to the terms of the agreement between the parties.'" *Id.* (quoting *JP Morgan Chase Bank, N.A. v. Longmeyer*, 275 S.W.3d 697, 704 (Ky. 2009) and citing *Anderson v. Old Nat'l Bancorp*, 675 F. Supp. 2d 701, 721 (W.D. Ky. 2009) (citation modified)). Based on this and other caselaw, Defendant argues the contract language forecloses any duty Plaintiff might claim. *See id.* at 10 (citing *Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997), *aff'd*, 162 F.3d 1161 (6th Cir. 1998)).

In response, Plaintiff does not contest the language of the SVA form, challenge its legality, or otherwise challenge Defendant's arguments based on the SVA form, the Deposit Agreement, or the Online Banking Service Agreement. *See* [R. 71, pp. 16–17]. Instead, Plaintiff lodges three arguments: (1) "[o]nce [Defendant] undertook to act," it "cannot invoke contractual disclaimers to avoid liability for [its] . . . voluntary undertaking," *id.* at 16; (2) Defendant had a duty of care to provide documents and "accurate account information," *id.*; and (3) "Kentucky recognizes negligent misrepresentation as an independent tort duty," one which "exists independent of any contractual privity," *id.* at 17.

---

[6] Because the only duty alleged here involves "conduct occurring after the funds transfer process," [R. 71, p. 16], the Court believes the SVA form provides the most relevant contract terms. *See* [R. 65-12 (SVA form) (describing the efforts Defendant would undertake to recover Plaintiff's funds)]. Although the Deposit Agreement and the Online Banking Service Agreement each contain provisions addressing Defendant's liability under circumstances similar to these, *see* [R. 65-6, pp. 60, 74 (Deposit Agreement)]; [R. 65-7, p. 15 (Online Banking Service Agreement)], the Court principally rests its analysis on the terms of the SVA form.

As to Defendant's contractual argument, and based on the records before the Court, the Court agrees Defendant had no broad duty to ensure the recovery of Plaintiff's wired funds or as otherwise argued by Plaintiff. Notably, even Plaintiff agrees that the only negligence claims that remain after the Court's Memorandum Opinion and Order, [R. 31], that addressed Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, [R. 18], are those that "concern conduct occurring after the funds transfer process." [R. 71, p. 16]. Those efforts are necessarily governed by the valid contract entered between the parties pursuant to the terms of the SVA form, and Plaintiff nowhere challenges the terms or the legality of the SVA form. *See Longmeyer*, 275 S.W.3d at 704 ("[T]he . . . agreement established a contractual relationship between [the bank and its customer]. And the duties arising from that relationship were limited to the terms of the agreement between the parties."); *see generally* [R. 71 (nowhere challenging the SVA form)]. As the Court has already explained, the SVA form establishes a specific contractual relationship and associated duties. Namely, it provides that Defendant's recovery efforts are a "voluntary accommodation," permits Defendant to exercise its "sole and absolute discretion" in pursuit of those recovery efforts, "provides no assurance" that recovery efforts will be successful, and warns that efforts "may result in no recovery." [R. 65-12, p. 3 (SVA form)]. On these facts, the SVA form forecloses Plaintiff's negligence theory.

However, even if Plaintiff's theories were not foreclosed by the language of the SVA form, Plaintiff fails to raise a genuine issue of material fact as to any breach of a voluntary undertaking or a duty to provide documents, or that Defendant negligently made material misrepresentations that were reasonably relied on by Plaintiff.

b. *Voluntary Undertaking*

In addressing Plaintiff's voluntary undertaking theory, Defendant contends that it did not engage in a "voluntary undertaking" to pursue the recall of Plaintiff's $650,000 wire transfer. [R. 65, pp. 20–22]. The "threshold inquiry under this doctrine is whether the putative tortfeasor has actually and specifically undertaken to render the services allegedly performed without reasonable care." *Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840, 847 (Ky. 2005) (citing *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir.1998); *In re Temporomandibular Joint [TMJ] Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir.1997)). Kentucky has adopted Sections 323 and 324A of the Second Restatement of Torts to govern these claims. *See Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998) ("In recognizing [the] principle [that voluntary undertakings cannot be negligently conducted], it appears that Kentucky has adopted § 323 and § 324A of the Second Restatement of Torts." (citing *Taylor v. United States*, 521 F. Supp. 185, 187 (W.D. Ky. 1981); *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1270 (6th Cir.1988))); *Wilburn v. United States*, No. 18-6005, 2019 WL 4729828, at *1–2 (6th Cir. May 1, 2019) ("In determining whether a defendant has voluntarily assumed a duty, Kentucky has adopted the Restatement (Second) of Torts § 323 . . . ."); *Wilburn v. United States*, 616 F. App'x 848, 853 n.1 (6th Cir. 2015) ("[T]he pertinent requirements of both [§ 323 and § 324A of the Second Restatement of Torts] are identical . . . .").

But "[b]oth sections [of the Restatement] . . . impose liability only for physical harm." *Ky. Laborers*, 24 F. Supp. 2d at 774. While another court has permitted recovery for property damage, *see Louisville Cooperage Co. v. Lawrence*, 230 S.W.2d 103, 104 (1950) ($3,000 in fire damage), Plaintiff here seeks to recover for his purely economic loss, *see generally* [R. 15 (Second Amended

Complaint)]. Moreover, and importantly, Plaintiff provides no caselaw to suggest Sections 323 and 324A of the Second Restatement of Torts governs such claims for purely economic loss, *see* [R. 71, pp. 14–15]. Plaintiff has thus effectively conceded this issue. *See Degolia*, 381 F. Supp. 3d at 759–60 (explaining that a plaintiff concedes those issues they fail to address in responding to a dispositive motion).

Additionally, Defendant points out that even if a voluntary undertaking duty applies, such a duty would be limited to the extent of the agreed-upon undertaking—here, to the terms as outlined in the SVA form. *See* [R. 65, p. 22 ("Plaintiff points to no specific request that would support such a duty [to recover the funds], and no basis to conclude that [Defendant] 'actually and specifically' voluntarily agreed to assume some special duty.")]. Defendant argues, rather, that at most, it merely agreed to "provid[e] an 'accommodation,' with 'no assurance' of success," as explained in the SVA form. *Id.* at 21. The Court agrees. "[T]he scope of [a voluntarily-undertaken] duty [is] limited by the . . . nature of [the] request" to assume it, *Brewer Mach. & Conveyor Mfg., Co. v. Old Nat'l Bancorp*, No. 2010-CV-001958-MR, 2011 WL 6111392, at *4 (Ky. App. Dec. 9, 2011), and the SVA form describes Defendant's recovery efforts as being undertaken due to Plaintiff's "request[]," [R. 62-12, p. 3]. Accordingly, to the extent Defendant assumed any duty pursuant to a voluntary undertaking, that duty was limited to the agreed-upon undertakings as outlined in SVA form, which—as the Court has already explained, *see supra* Section III.B.1.a— did not mandate that Defendant recover the funds.

As a final note, even if the Court found a voluntary undertaking duty applied, the only breach to which Plaintiff points are the alleged misrepresentations by Defendant. *See* [R. 71, pp. 14–15]. Those arguments fail for the reasons explained below. *See infra* Section III.B.1.d.

- 19 -

Accordingly, the Court finds the voluntary undertaking theory does not impose a duty on Defendant that would permit recovery in this case.

### c. Duty to Provide Documents

As to Plaintiff's theory related to the provision of bank records, Defendant argues it had no duty to provide Plaintiff with documents detailing Plaintiff's wire transfer. [R. 65, pp. 22–24]. Defendant points out that while Kentucky law requires a bank to "furnish the depositor with a statement of the account" and to "provide . . . records relating to the various past accounts, loans, and agreements" between a depositor and their bank, *Ousley v. First Commonwealth Bank of Prestonburg, Ky.*, 8 S.W.3d 45, 46–47 (Ky. Ct. App. 1999), this duty is grounded in the duty to provide "periodical statements" as conveyed by Section 276 of the Corpus Juris Secundum Banks and Banking, which merely requires a bank provide periodical statements "to a mailing address of the depositor's choosing, sufficient to allow the depositor to review and report errors on his account, which would include pictures of any checks." *id.* at 22–23, 22 n.4 (citing 9 C.J.S., Banks and Banking § 276; K.R.S. §§ 355.4–406). In its reply, Defendant argues neither *Ousley* nor Section 276 nor the parties' agreements impose any duty to "provid[e] customers with SWIFT documentation, third-party bank documents or confidential interbank communications such as those Plaintiff sought here." [R. 73, p. 13]. Moreover, Defendant claims that even if it had such a duty, Defendant did not breach it, since it provided Plaintiff with the "wire advice [which] contains the same information as the MT103" and since "Plaintiff has no evidence that CBD would have acted differently with a SWIFT message or MT103 or that an MT103 is more authoritative than a wire advice." *Id.*

The Court finds Defendant's arguments persuasive. To start, Plaintiff nowhere suggests that any duty held by Defendant extends beyond the requirement to provide "accurate records of

their accounts." *See* [R. 71, p. 19]. In Plaintiff's brief response, its only cited case, *Ousley*, addressed the right of a bank's former customer to "records regarding his accounts and loans," but imposed no duty on banks to specifically provide SWIFT messages or MT103s. *See* 8 S.W.3d at 46–47. Plaintiff's response cites to no caselaw or other authority that suggests such a duty exists. *See* [R. 71, p. 19]. Moreover, and regardless of the precise contours of *Ousley*'s holding, Plaintiff cannot point to any information he would have gained from an MT103 or SWIFT messages that he did not already have from the wire advice. *See* [R. 65-2, pp. 64:4–18, 100:7–16 (Sexton Depo.)]. Indeed, Defendant suggests that the only reason Plaintiff sought SWIFT messages or MT103s from Defendant was because Wesam and Options, the scammers, directed him to do so. [R. 73, p. 13]. The Court's review of the record confirms the requests for SWIFT messages and MT103s came from Wesam and Options only *after* Plaintiff had sent them $650,000, in what appears to be a tactical maneuver to delay Plaintiff's realization that he had been scammed, [R. 65-17, p. 4 (Wesam representative requested SWIFT messages on April 20, 2021 after Plaintiff stated he wired the funds)]; [R. 65-16, pp. 52–53 (Options representative requested MT103 information on May 6, 2021)]. Plaintiff's response also does not dispute Defendant's claim that the wire advice contains the same information that would be present in SWIFT messages and MT103s. *See* [R. 65-1, pp. 29:10–30:3]; [R. 65, pp. 23–24]. Taken together, the Court finds Defendant had no duty to provide Plaintiff with SWIFT messages and MT103s given Defendant already provided Plaintiff with the wire advice information, and alternatively finds that to the extent any such duty existed, Plaintiff fails to show Defendant did not meet that duty to provide SWIFT messages and MT103s by providing wire advice information instead. The Court therefore finds any duty for Defendant to provide records does not support Plaintiff's claims for relief.

        *d.  Negligent Misrepresentation*

Finally, Defendant argues it made no negligent misrepresentation that would subject it to liability. [R. 65, pp. 24–27]. In Mr. Sexton's deposition, Mr. Sexton suggested Defendant made a negligent misrepresentation during the June 21, 2021 phone call in which Defendant's representative purportedly stated Defendant's recovery efforts were successful and Plaintiff's money was being returned.[7] [R. 62-2, pp. 165:10–168:24 (Sexton Depo.)]. Among other arguments, Defendant's motion for summary judgment points out that this alleged duty was not raised in Plaintiff's "operative complaint or interrogatory responses." [R. 65, p. 24]. Defendant's reply further notes that "[i]t is well established that a 'plaintiff may not amend her complaint through argument in a brief opposing summary judgment,'" citing numerous cases in support. [R. 73, p. 14 (quoting *Rhea v. Fifth St. Hi-Rise, Inc.*, No. CIVA 04-374-C, 2006 WL 2591014, at *3 (W.D. Ky. Sept. 8, 2006), and then citing *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 451 (6th Cir. 2007); *Johns v. Cathey*, No. 1:21-CV-00136-GNS-HBB, 2023 WL 1825074, at *1 n.1 (W.D. Ky. Feb. 8, 2023); *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017, 1019 (S.D. Ohio 2007))]. Plaintiff's response nowhere addresses the deficiency in its Second Amended Complaint as to its allegation. *See* [R. 71, pp. 17–19]. Plaintiff, therefore, concedes this point. *See Degolia*, 381 F. Supp. 3d at 759–60 (explaining that a plaintiff concedes those issues they fail to address in responding to a dispositive motion).

The Sixth Circuit has counseled that "[i]t is improper for a plaintiff to raise a new legal claim or theory for the first time in response to a summary judgment motion." *Lunneen v. Vill. Of*

---

[7] Plaintiff's expert witness, Mr. Al Shamsi, makes a similar assertion, characterizing it as "negligent" for Defendant's "representatives to tell Plaintiff the Funds were bring returned." [R. 66-1, p. 16]. Because the Court has already found Mr. Al Shamsi's expert testimony unreliable and therefore inadmissible, *see infra* Section II.B, the Court will address only the claims of negligent misrepresentation made during Mr. Sexton's deposition.

*Berrien Springs, Michigan*, Nos. 22-2044; 22-2046, 2023 WL 6162876, at *13 (6th Cir. Sep. 21, 2023) (citing *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)); *see also J.H. v. Williamson Cnty., Tennessee*, 951 F.3d 709, 722 (6th Cir. 2020) ("[O]nce a case has progressed to the summary judgment stage, . . . the liberal pleading standards under . . . the Federal Rules are inapplicable." (citation modified)). To permit a plaintiff to raise a new claim at the summary judgment stage "would subject defendants to unfair surprise." *Tucker*, 407 F.3d at 788. Here, Plaintiff was certainly either aware of the June 21, 2021 phone call and the purported misrepresentation therein when it filed its original Complaint on November 3, 2022, *see* [R. 1-2], when it filed its Amended Complaint on January 6, 2023, *see* [R. 11], and when it filed its Second Amended Complaint on February 2, 2023, *see* [R. 15], or was able to seek leave to amend its complaint for a third time. Accordingly, the Court need not consider Plaintiff's fraudulent misrepresentation theory. *See Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir.1997) (affirming the district court's refusal to consider a new claim that was raised for the first time on summary judgment because the plaintiff had been "free to seek leave to amend her complaint").

Regardless, even if the Court considers Plaintiff's negligent misrepresentation theory, Plaintiff raises no genuine issue of material fact to suggest that Defendant made any misrepresentation. First, as Defendant points out, each of the statements Plaintiff might claim were misrepresentations were generally true at the time they were made. *See* [R. 73, p. 15]. For example, during one phone call, Defendant's employees stated that Defendant had the "whole scam part of that figured out" and was "just waiting for the funds to return to the account," [R. 65-25, p. 2:18–20], that Plaintiff's recall request was "resolved within [Defendant's] end and [Defendant was] just waiting for the actual collections part of this," *id.* at 3:2–4, and that Plaintiff's request had been "updated to . . . pending collection status after reaching out to the bank in Dubai," *id.* at 3:11–

13. None of these are an "affirmative false statement" as required by Kentucky law. *See Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011). The record reveals that at the time Defendant's employee made these statements, Defendant was, in fact, not only aware that Plaintiff had been scammed, *see* [R. 65-12 (SVA form)], but was also waiting for CBD to return the funds once it received Options' authorization to do so, *see* [R. 65-1, pp. 40:17–41:24, 42:10–43:2, 48:8–22] [R. 65-10, p. 6 ("[CBD has] requested debit authority from [Options] and will proceed to return funds upon receipt of same.")]. Plaintiff thus cannot show any genuine issue of material fact exists as to any misrepresentation. Further, because the record also makes clear that Plaintiff knew by July 8, 2021 that Defendant had failed in its recovery efforts, nor can Plaintiff demonstrate his own reliance on any alleged negligent misrepresentation. [R. 65-2, pp. 166:18–167:7 (Sexton Depo.)]; *see Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695, 707 (W.D. Ky. 2013) ("Under Kentucky law, a plaintiff asserting negligent misrepresentation must prove that . . . the plaintiff acted in reliance thereon . . . ." (citing *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580–82 (Ky.2004))).

Taken together, the Court finds each alleged duty that might support Plaintiff's negligence claims fails, and in any event, there was no breach of any such potential duty.

### 2. Causation

While the Court finds Defendant's lack of duty to Plaintiff and lack of breach as to any such duty sufficient to award summary judgment in Defendant's favor, the Court will also alternatively consider whether Plaintiff's claims meet Rule 56's standard as to causation.

"In Kentucky, a plaintiff pursuing claims for . . . negligence . . . bears the burden of establishing [causation]." *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 714 (W.D. Ky. 2013) (citing *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 537 (6th Cir.1995)). "Further, under

Kentucky law, causation or proximate cause is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing out plaintiff's harm?" *Id.* (quoting *Morales*, 71 F.3d at 537 (quotations omitted)). Evidence of causation "must be sufficient to tilt the balance from possibility to probability." *Id.* (quoting *Morales*, 71 F.3d at 537 (quotations omitted)). "[A] court may . . . grant summary judgment on the issue of causation when warranted, though, ordinarily, causation is a question to be resolved by a jury." *Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 361 (6th Cir. 2012) (citation modified).

Defendant's motion for summary judgment contends that Plaintiff cannot establish causation, since "Plaintiff's harm was caused by its own actions or by the actions of scammers— it cannot be traced to [Defendant]." [R. 65, p. 28]. In its response, Plaintiff attempts to establish causation by citing the testimony of Mr. Al Shamsi that "it is more likely than not that Plaintiff could have recovered the funds" had he pursued a cause of action in the UAE within ninety-to-one-hundred-and-twenty days of the transfer, [R. 71, p. 21 (quoting [R. 72-1, p. 7])], and to the testimony of Mr. Sexton that he would have pursued legal action in Dubai had he not been told that his funds were in the process of being returned or frozen in Options' account at CBD, *id.* (quoting [R. 65-2, p. 168:19–24 (Sexton Depo.)]). Defendant's reply argues that "[n]o reasonable jury could credit either contention," since Plaintiff's own testimony indicated he understood the funds would not be returned by July 8, 2021, and since "at no point—not just during the three weeks when Plaintiff claims to have been under the misimpression that the matter was resolved— did Plaintiff actually pursue any recovery options available in Dubai." [R. 73, pp. 17–18].

Because the Court has already found Mr. Al Shamsi's expert opinion to be unreliable and therefore inadmissible, *see supra* Section II.B, the Court will consider only the testimony of Mr.

- 25 -

Sexton in determining whether Plaintiff survives summary judgment as to causation.[8] As the Court has already outlined elsewhere, *see supra* Section III.B.1, Mr. Sexton testified during his deposition that Defendant's representative made a negligent misrepresentation during the June 21, 2021 phone call in which Mr. Sexton understood the representative to have stated that recovery efforts were successful and Plaintiff's money was being returned. [R. 62-2, pp. 165:10–168:24 (Sexton Depo.) ("I was told the funds were being returned.")]. Defendant's employee represented that it "could take anywhere up to July 8 for [the funds] to return" to Mr. Sexton's account. [R. 65-25, p. 3:4–5]. By July 8, 2021, Mr. Sexton realized the funds had not been returned as he believed they should have been. [R. 62-2, pp. 166:18–167:7 (Sexton Depo.)]. As a result, Mr. Sexton stated he was "lulled into inaction" since Plaintiff did not "pursu[e] whatever actions were available to it on the ground in the UAE with law enforcement, with attorneys, with anyone that would help me here and there, everywhere." *Id.* at 168:15–24.

Even assuming for the sake of argument that the statements by Defendant's representative during the June 21, 2021 phone call were misrepresentations, Mr. Sexton's testimony is insufficient to establish that Defendant's (assumed) negligence was a substantial factor in bringing about Plaintiff's harm. A detailed examination of the record makes this clear. Mr. Sexton sent $650,000 to the scammers on April 20, 2021, [R. 65-9, p. 2], and the funds were credited to Options' account by the next day, April 21, 2021, [R. 65-1, pp. 25:4–15, 26:2–7]; [R. 65-10, p. 8]. The record thus reveals that the funds were in the scammers' control the very next day after they

---

[8] As the Court has already noted, even if the Court accepts Mr. Al Shamsi as reliable and credits Plaintiff's theory incorporating his expert opinion, Plaintiff still cannot prove causation under his own theory. *See supra* Section II.B. This is because Plaintiff admits he knew by July 8, 2021—within ninety days of the wire transfer—that Defendant's recovery efforts had failed. [R. 65-2, pp. 166:18–167:7 (Sexton Depo.)]. Additionally, the terms of the SVA form reveal that Plaintiff was told—and agreed—that it was his responsibility to hire counsel and file a lawsuit if the Recipient Bank failed to return the funds. *See* [R. 65-12, p. 4]; *see also supra* Section III.B.1.a.

were sent, and long before any recovery actions were undertaken by Defendant. Taken together, the timing of the wire transfer, the scammers' control over the funds, and Defendant's recovery efforts reveal that *the scammers* caused Plaintiff's loss, not any negligence by Defendant.

Further, within weeks of the initial transfer, Mr. Sexton realized Plaintiff had been scammed. [R. 65-19, p. 30 (describing "possible fraud" in an email on May 5, 2021)]; [R. 65-16, p. 50 (stating "I have been defrauded" in an email on May 10, 2021)]. Over a month *after* this realization, on June 15, 2021, Defendant offered to help Mr. Sexton recover the funds, and Mr. Sexton signed and returned the Scam Victim Acknowledgement form. [R. 65-12, p. 2]. Prior to the allegedly negligent phone call on June 21, 2021, although Mr. Sexton "Googled and randomly found some lawyer" who indicated he needed SWIFT messages to assist Plaintiff, [R. 65-2, p. 155:4–9 (Sexton Depo.)], Mr. Sexton never contacted law enforcement in the UAE to attempt to recover Plaintiff's funds, nor did he contact any other independent authorities in the region, *id.* at 156:1–157:10, 170:13–18. It does not appear from the record that Mr. Sexton even contacted another Dubai attorney to seek a second legal opinion. *See id.* at 170:13–18 (indicating nowhere that Mr. Sexton contacted an attorney besides the one he had found online). To the extent Mr. Sexton, a lawyer himself, claims Defendant's purported misrepresentation on June 21, 2021 caused him to be unable to recover Plaintiff's funds, the Court questions why Mr. Sexton's *own* failure— his decision not to diligently avail himself of the legal remedies available to him in the UAE shortly after he realized Plaintiff had been scammed—is not the true proximate cause of Plaintiff's inability to recover the funds.[9]

---

[9] As the Court has already explained, an even more proximate cause of Plaintiff's loss is the actions of the scammers themselves, without which Plaintiff would not have wired the $650,000 in the first place.

Furthermore, the record reveals that Mr. Sexton's own statements call into question whether he truly understood the statements of Defendant's representative to constitute a promise that Plaintiff's funds were about to be returned. Although Mr. Sexton testified to this effect during his deposition, *see* [R. 65-3, pp. 12:17–13:8 (indicating that he believed the "money was on its way back" after the call and felt "an incredible sense of relief")], Mr. Sexton complained to a CBD representative on June 29, 2021 that Options would "never" provide the debit authority needed to return the funds to his account and accused CBD of being "complicit in this scam by continuing to seek debit authority that it knows will not be forthcoming." [R. 65-21, p. 4]. It was thus well *before* July 8, 2021—the date by which Mr. Sexton understood the funds would be returned to his account because of Defendant's recovery efforts—and long *before* November 5, 2021—the date Defendant formally informed Plaintiff its efforts were unsuccessful—that Mr. Sexton understood that the funds would "never" be returned to Plaintiff. *See id.*; *see* [R. 71-5]. Finally, even after July 8 came and went, Plaintiff never contacted legal counsel or law enforcement in the UAE to pursue his recovery options there. [R. 65-2, p. 170:19–24].

Plaintiff's present allegation that Defendant's purported misstatement on June 21, 2021 was a substantial factor in his inability to recover the $650,000 utterly ignores other causal factors at play that led to Plaintiff's loss far more directly, including the actions of the scammers and Plaintiff's own inaction in failing to seek legal counsel or contact law enforcement in the UAE; any notion that Plaintiff's reliance on any statement by Defendant was the true cause of his loss is speculative, incredulous, and wholly without support. Accordingly, the Court finds Defendant was not the proximate cause of Plaintiff's loss, and therefore concludes summary judgment in Defendant's favor is appropriate.

## IV.    CONCLUSION

For the above-stated reasons, the Court will grant Defendant's motion to exclude and motion for summary judgment. Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion to Exclude Expert Testimony of Obaid Omran Ali A Shamsi, [**R. 66**], is **GRANTED**.

2. Defendant's Motion for Summary Judgment, [**R. 65**], is **GRANTED**.

3. This matter is **DISMISSED WITH PREJUDICE** and **STRICKEN** from the Court's active docket.

4. A separate Judgment shall follow.

This the 16th day of July, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY